May it please the Court, Henry Bunso from Power v. O2 Micro. The lower court abused its discretion in failing to grant a new trial on all issues addressed by the court-appointed expert. We are asking you to order a new trial on all issues addressed by the court-appointed expert. In addition, the on-sell bar verdict should be reversed because the evidence does not meet the statutory or case law requirements. Regarding the appointment of a court-appointed expert, we are not attacking Evidence Code 706. Here, the lower court abused its discretion under Evidence Code 706 for the following reasons. First, there was no need to have a court-appointed expert in two prior jury trials involving this family of patents, one of which involved the very same patent, which is the appeal you will hear next. The juries had no trouble. Is there some need standard for a 706 appointment? I think you have to look at the overall context. Is there a requirement that there be a need before you can appoint an expert? There is not a requirement, but the cases in which an expert has been appointed have identified specific needs before doing so. So there are case law indications that if there is a need that is in support... But there is no requirement? There is no statutory requirement. So that's behind this. That's correct. Neither party requested a court-appointed expert. Both parties had retained experts that were prepared... Something entirely within the discretion of the trial judge. Why would you question the trial judge's discretion? I would question the trial judge's discretion in this particular case for several reasons. First, the court-appointed expert was appointed too late. There were two other prospective experts who said they simply would not have had the time, and the court acknowledged that. But isn't that dependent upon the type of experts that you get? The quality of the experts also, and their ability to absorb the material. Maybe that particular expert knew the material a little bit better than the other two. In that particular case, that could very well be right. In this case, however, this expert was not able to do that. Did you have the ability to cross-examine the expert? Yes. You took that opportunity to cross-examine the expert? Yes, I did. And I would refer the panel to trial record at A11021 through 23, because I think that testimony is particularly illuminating. What the expert testified about in this case was, A, he'd never been involved in a case before. B, he had never been called upon to render opinion. All of this is entirely irrelevant, isn't it? Whether he's testified in a case before is wholly insignificant. The trial court judge gave an instruction to the jury that they could weigh this evidence, accept it, reject it, they accepted it. What's your complaint? There is a gatekeeping function that the trial court is bound to discharge. This expert would have had to meet the requirements of 702, fundamentally as an expert. We objected that this expert did not meet the requirements of 702. For example, this expert had no particular education. Why don't we move on to something of more importance to this court? Why don't we talk about the on-sale bar? Did you raise in a way that this court could review the foreign nature of the sale? Yes, we did. And if you look at the written JMAL motion that was filed at the end of the case, you will see explicit reference to the on-sale bar issue. If you look at the transcript portions that we quoted in our brief, you will see that there was a discussion, and this was not my discussion, it was a discussion between the court and opposing counsel about the requirements of the in this country requirement of proof for certain of the defenses that were being raised. So, yes, we did preserve that for appeal, and it's probably before this court. I made a broad-based JMAL after the conclusion of their case. Even if that is inadequate, there were subsequent discussions and there were subsequent JMAL motions that preserved it for the purposes of this court. Now, what do you think the statute requires when it asks that the invention be on sale in this country? Do you think it requires that the particular invention being offered to this particular purchaser be on sale or that the invention generally be on sale in this country? I think the former, I'm sorry, the former would certainly qualify. It doesn't have to be a general offer for sale. If there's a single offer for sale in the United States, that would qualify. This was not a single offer of sale to anybody? To anybody, yes. And I don't believe that there was any of the indice for an offer for sale in this country. And even if you say that the Robbins case, which is the case that the lower court relied on, a 1973 Ninth Circuit case, even if you say that that is good law, which this court has never said, that certain preparatory activities, the preparatory activities here were some undefined design work, perhaps buying airline tickets, perhaps sending some communications. What about the March 15th email? The March 15th email is not a consummation of an offer. It is a communication of we may be able to do it. And if you read that email, you will see that there is substantial doubt expressed. Why isn't the AMBIT request for changes a counteroffer, which the March 15th email from the United States accepts? That's the best argument. It's that AMBIT made a proposal and that was subsequently accepted. The problem is it doesn't meet the FAF requirements, and it doesn't meet the Group 1 requirements. Group 1 was cited by this court as recently as November 21st. There are no specific quantities. There are no delivery dates. There are no pricing. All of the indice that FAF says you must find... But you don't need any of those indices under the UCC, do you? Can we apply the UCC in this particular case? I'm sorry? Can we apply the UCC requirements in this particular case? I don't think you can apply the UCC requirements to trump the FAF requirements that the United States Supreme Court said must be present in order for there to be on sale for the purpose of invalidating the United States FAF. The thing the Supreme Court said was that the product must be the subject of a commercial offer for sale. Correct. Why doesn't that incorporate the concepts of the UCC? It incorporates some of the concepts of the UCC, undoubtedly. But this court has looked to other indices for a finding. For example, one of the requirements is that it be ready for patenting. That is not a UCC requirement. That was not met here. There is no evidence that... That's another requirement. That would be an additional requirement. That's correct. It could also be necessary only under the UCC to have an offer which meets all of the UCC requirements. It may meet the UCC requirements, but it doesn't meet an invalidating offer requirement for the purposes of invalidating a patent. That's my point. Didn't Linear Tech, our 2001 case, say that the UCC will inform the entire analysis here? I agree. I agree that it does. But it is not the entire analysis. It informs it. However, for example, the concept of ready for patenting, which was not met in this case, is one that clearly must be shown in order to have an invalidating sale. Aren't you really arguing whether the facts add up, whether the various different things that occur, aren't you really arguing whether those add up to a commercial offer for sale? I am arguing the only facts that were admitted. Mr. Shannon, who was a co-developer of this product, testified that the only evidence of the inclusion of a second state current control open land protection was in November of 1998. That is after all the prototypes, and don't get confused by the NP-1010 designation, because that changed over time and was different products. So the co-developer testified that the key elements of the claims of the 722 patent that would have to be shown in order to establish ready for patenting and in order, under the Group 1 case, to make the correlation that's required for on sale, there was no evidence until November of 1998, well after the critical date. Those are the facts that are undisputed. Those are the facts that we argue, and that is the only conclusion that could have come. Now recall that this was not even a defense that was initially raised in the pleadings of this case. It's not in the pretrial order. You will not find any reference to it in the opening statements. This was something that was thrown in in the middle of the trial as an afterthought, and in fact, when you look at the testimony, you will see why. Everybody knew that Mr. Shannon was going to testify that November 1998 was the first date that he could establish for the requirement of any type of correlation between the claims. You won't find testimony correlating the schematic drawings with the limitations of the claims. You won't find testimony... Well, were the schematic drawings completed in April of 1998 as drawn in the NP-1010? The original NP-1010, which did not have current control and did not have the second state that is required by all claims of the patent. Those schematic drawings are top-down drawings of an integrated circuit, is what they are. And if you look at the communications, for example, that followed the AMBIT meeting, you will see that Mr. Moyer was told at the AMBIT meeting, by AMBIT, you need to modify your design to include current control, which is very important. You're monitoring the current through the lamp, not on the primary side of the transformer. And he wrote back, I'll see if we can do it. Which they did within a week on the way back, wasn't it? He says he did, but there's no linking evidence of that, and there's no proof that he's done. Why do I have the feeling I'm listening to an argument to the jury? Because we have a jury verdict. We have a jury verdict that, I agree, we do have a jury verdict. But the jury verdict has to... It's against you on this issue. It is against me on this issue. Why do I have the feeling we're getting that argument replayed for us? Because that is really what we do. Because there must be substantial evidence to support the jury verdict. And in this case... It's a very low threshold, isn't it? It's a very low threshold, but in this case, the only evidence to support the jury verdict is the direct evidence, the linking evidence that Group 1 requires, the type of evidence that FAF requires. The best illustration of that is Mr. Shannon's testimony, in which he said it didn't exist until November of 1990. While we're on the jury verdict, let me ask you a question. It puzzles me. Maybe there's an explanation for it. The question that was put to the jury on this issue was, do you find that defendants have proved that it is highly probable that any claim of the 722 patent is invalid because the invention was on sale in the United States? Highly probable is an interesting test. Did you all stipulate that that was the same as clear and convincing? Is that what happened? Highly probable is the language that I would say over the last five to six years has been adopted as the parlance, the common parlance for clear and convincing evidence. And I've used it in many trials, and judges seem comfortable with it. So you will find that language. First time I've encountered it in appeals. I see. That's the explanation for it. Everybody agrees that means clear and convincing. Yes, it does. Okay, thank you. And I don't know if I'm into my rebuttal time, but if I am, I'd like to reserve what's left unless there are further questions. Thank you. Thank you, Your Honor. Dan Bagatelle of Perkins Coie on behalf of Monolithic Power Systems. I'd just like to respond to each of the points raised by Mr. Gunso. Briefly, I'll touch on the appointment of the independent expert. There had been two prior trials in the Eastern District of Texas, but Judge Boulton was also familiar with these parties and these issues. She had already presided over a trial between NPS and O2 Micro. She had already heard summary judgment arguments. She had seen expert reports, a claim construction briefing. She was very familiar with the issues and the difficulties raised. And, frankly, this was an ideal case to appoint an independent expert. The technology was extremely difficult, and it simply assisted the jury in making a rational decision. Does the independent expert assist the jury or the judge? In this case, it assists the jury. You can appoint an expert for the assistance of the court, for example, a special master at the claim construction phase. But an independent expert in this case was appointed to assist the trial of a fact, which was the jury. And he did. It was an extremely helpful testimony, not only in terms of the tutorials that he gave, but the practical explanations of means. Why could those be given by the parties' experts? Well, they can, but in this case the district court believed, and I believe correctly, that it would assist the jury to have a neutral presentation rather than two polarized experts. And it's really in the discretion of the court to decide whether it's going to assist the jury to have that extra view. I'm not saying that you require to appoint an independent expert, but it's a discretionary issue. And in this case, it was certainly an appropriate case because the technology was quite difficult, the experts were quite polarized, and she presided over these parties. Isn't it one thing to testify about the technology and another thing to testify on the question of obviousness, the ultimate decision for the jury? I think the independent expert should be treated like any other expert. In other words, the question is, is the testimony going to assist the trial of a fact? You could have an expert simply testify, this is current, this is voltage, and stop right there. But we don't let them testify to questions of law, do we? No, and he did not testify to questions of law. He specifically testified according to the technology and his application of the claim constructions to the infringement and limit questions that were raised in the case. Why do I have a feeling that obviousness is ultimately a question of law? It is, but it's based on underlying facts, and so he... So he testified to the facts, did he also testify to the question of obviousness? Yes, well, he gave a conclusion that he believed, for example, that Claim 12 was obvious in light of the prior... And he explained factually why. Isn't that a legal conclusion or a factual determination? Well, there are factual determinations that underline the question of obviousness. In fact, all three experts gave the ultimate conclusion, but the question is, of course, Graham v. John Deere facts, and he explained exactly why Claim 12 was obvious in light of the wide array of prior art that he discussed and was also discussed later in the trial. When he reaches a conclusion that's obvious, that's a legal conclusion. The ultimate conclusion is a legal conclusion. So, for example, negligence can be the ultimate determination by a jury, but they're relying on underlying facts. And he explained, he didn't simply say, and I deem it obvious, he explained exactly why each element of, for example, Claim 12 was present in the prior art and why he thought it was totally obvious. We have an interesting situation here. We have two juries, as we're going to find out in a second, who've reached different results on the same path. The difference seems to be one judge had an independent expert who didn't seem to be very independent. Well, I disagree. To what extent do we take that into consideration? Well, let me answer the first question, which is whether he was independent. He was definitely independent. He reached views that disagreed with both sets of experts. He found infringement of Claim 12 on a different basis than O2's expert did. He relied on a different feedback group. He found infringement under the Doctrine of Privilege. In fact, the jury did not always agree with him. The jury did not always agree with any of the experts. So he did not agree with both of the experts, and the jury did not always agree with him. But getting back to your other question is, why would we have different results in different cases? Well, the lawyers were different. The evidence was different. And in particular, in addition to Professor Satya, there was important evidentiary ruling made in Texas allowing some rather prejudicial evidence to come in. That was not allowed in our case, and that was evidence relating to the supposedly trade secret misappropriation long after MPS had developed this product. I think you'll hear from, in the next case, why that may have been prejudicial. But there were different records in the two cases. And of course, different judges make different discretionary rulings. I understand that. But it's the nature of the jury system, when you're going to have disputable questions of fact, that different juries can come up with different answers. I don't want to answer O2's argument that the expert was selected too late in the process and just didn't have enough time to digest for the jury. Well, he specifically answered that question, both in demonstration and at trial. He said he had enough time to prepare his report. Remember, he was on sabbatical that semester. He had 35 days to prepare his report. He prepared a 27-page, single-spaced report with a whole bunch of playing charts attached. It was very detailed. It was a completely independent analysis. He also had a lot of expertise going in. It's important to remember that he was one of ordinary skill in the art of the time. He was extremely familiar with power electronics as a Ph.D. from Caltech. And then, in the relevant time frame... That's a person of ordinary skill in the art. Well, he had more than a bachelor's degree and four years of experience in the industry. But he had actually designed a fluorescent ballast in the relevant time frame. That's ordinary skill, or is that super-ordinary? It may be super-ordinary skill in the sense that he had a Ph.D. rather than a bachelor's degree. I think, at the time, he had several years of experience in the industry. Of course, today, he has more experience in the industry. Your argument is that it's better to be overqualified than underqualified? Absolutely. So he understood feedback circuits and timing circuits, in other words. Oh, yes. He's very familiar with power electronics. In particular, power electronics is applied to fluorescent lights. Can you imagine a circumstance where this court would say, to turn the trial over to an independent expert? And is this that case? Well, I think the question is whether the district court makes it clear to the jury that the independent expert is offering an opinion, but you are not bound by that opinion, and you should not give that opinion any additional weight, simply because, in this case, it was an expert appointed jointly and retained by the parties with the direction of the court. She gave that instruction twice. She did not say, simply defer to the expert. Just as she did not say that the experts should simply choose among the opinions of the existing experts, she specifically told the jury, repeatedly, what the burdens of proof were. How could we have told the jury's verdict that a foreign sale is somehow erecting a war? It was not a foreign sale, Your Honor. The only thing that occurred in Taiwan was a face-to-face meeting. They're over in Taiwan doing the negotiations. That means if there's an offer, it's made in Taiwan, right? Well, I believe what happened was the only thing that occurred in Taiwan was a face-to-face meeting. They went to Taiwan. Ambit said, we really like the product. We'd like to use the product. We'd like you to make four changes. MPS went back home, made the four changes, said we can do it. We confirmed that it was willing to go forward on Ambit's terms. That was an offer for sale made from the United States. What was the price on that sale? What was the quantity on that sale? What were the terms of that sale? Before you have an offer, you've got to have terms of specificity under any contract law. Well, under contract law, you're required to have an identification of the product, and we clearly have that. We knew exactly what Ambit wanted. MPS only had one product at the time, and they specified exactly what they wanted it to include. That sheet that was presented on March 6th of 1998 also listed specific quantities and dates. So we knew the quantities, we knew the dates, and we knew the products. That's all the UCC requires. It didn't list prices. I will acknowledge that. But the UCC does not require prices. And if you look at the quantities that were at issue, they were relatively modest quantities, products that were selling for about $1, $1.50. It didn't have a price. It did not have a price. That's irrelevant, but do you ever have a deal without a price? I'll sell you my car. You buy it? Well, it requires that ---- My price happens to be $1 million, but I thought you knew that. No. I think what you have to have is enough specificity in a commercial setting so that the parties can enforce a contract. And in this case, these products were sold in the market. There were many other competing products, so we knew what the market price was going to be within a range. And the UCC specifically allows the court to fill in that gap. In fact, I believe the linear case that Your Honor mentioned specifically mentions that fact. Which is your better defense, the unsealed car or the obviousness? If you had to pick one, which would you like to stand on? Oh, I would say the obviousness defense, Your Honor. In that case, why don't you talk about that for a minute? Well, I'm happy to talk about any aspect of the obviousness. Henry teaches a comparator. Claims require a flow-through switch. What's the difference? Well, let's talk about the flow-through switch. What the patent requires is a flow-through switch. This is in Claim 2 of the 722 patent. And it requires a flow-through switch, and a flow-through switch is defined as something that ---- You can compare two signals, and you're going to select one over the other and send that signal on. Is there ever a comparison made by Henry? Well, yes. Henry's just a yes-no. It's a logic switch. No, no. Henry has a comparator 740, Your Honor. And comparator 740 has an input. If you look at the input side of 740, there's a node 720. And if that input is high, it will actually flow through that comparator and output a high. That is a flow-through from high through the comparator, and it becomes high. The same thing if it is a low or a zero. It's a zero. It flows through from node 720 through the output, and it does the exact same thing that happens in the 722 patent. That decision tells you whether to go into normal feedback operation or to go into some lower power state, a second state with a lower power to the load. In this case, a 50% duty cycle is how high the feedback is. So the feedback operation would not essentially be a switch at that point, would it? It would not be a comparative aspect of the system? No. Actually, plane 2 requires a flow-through switch that causes you to go into one of the two states. And that's exactly what we have here. Is that an on-off switch at that point, or is that just a logic switch that tells you what level it should be at? It is a logic, just as in the 722 patent. It tells you to go into the first state or the second state. So it's not a comparative? Well, it's drawn as a comparator in the Henry patent. In the Henry patent, but it's not really a comparator. It's almost like a logic switch. It acts like a logic switch. And correct, and that is why Professor Hornstein testified that it did perform the propulsion flow switch. And my key point on this one is, if O2 wanted to challenge that, the time to do that was at trial, not in after-trial afterthought. This was made up completely in post-trial motions. It was not raised at JMAW. It was not addressed by O2's experts. They're coming in late in the day and trying to say, ah, gotcha, you didn't touch second base. Well, in fact, we did touch second base. But beyond if they had waived it. They did waive it, for purposes of JMAW. Hypothetically, if they did not waive it, it would still be a problem. It is not a problem for the reasons that you and I have just discussed. The standard would be only under the abuse of discretion standard for a new trial, which requires an absolute absence of evidence. It certainly isn't contrary to the great weight of evidence when the only evidence on the point supported the jury's word. But the Henry Patent only teaches outputting predetermined states. It doesn't allow either of the input voltages to flow through, right? No, that's not correct. I think if you look at column 14 and column 16 of the Henry Patent, I can give you the precise line numbers if that's helpful. If you look at column 14, lines 47 to 51, I think it discusses the high flow through. And at column 16, lines 4 to 11, and that's on page A11115, it discusses the low on the node that inputs the comparator 740. And it precisely explains how— But those high, low, or predetermined states, right? Well, they are passing through the value of the input to the output, which is exactly what the claimants construed to require. And that results in triggering one of the two states. Yes, it triggers either going to— High, low, or predetermined states, exactly what I said. Yes, so it determines whether you're going to get a predetermined minimum power to load via the sawtooth generator circuitry, or you're going to go into normal feedback. But that's somewhat different from what the patent claims require. I don't think it's materially different. This isn't obvious. It's this. It's different in a couple of senses. One is that, as O2 has pointed out, it alternated between 0 and 100, which resulted in a 50% duty cycle. But the jury was certainly entitled to conclude that if you're half the time at 0 or half the time at 100, you can just as well have a set 50. This isn't obvious in this analysis. You said— Yeah. It was unpredictable. It was predictable on the basis of the known technology that had done it. Oh, absolutely. And there were numerous examples of second states. The Henry patent was only one of the ones that we offered at trial. The Ahrens and Cargill article, which, again, O2 did not even challenge at trial. It actually involved a phase-shift modulated full-bridge, so it really was right on point. It talked about reducing the overlap to a minimum in a false state. And that's right on. So you have two references right there. And then O2's own half-bridge 969 product started out with a minimum duty cycle of 20%, and that's right in the data sheet for O2 969. True, it was a half-bridge product, but a half-bridge product is a two-control signal product. I mean, there was lots and lots of testimony from all the experts that the market was moving from half-bridge to full-bridge. You can use the similar control techniques. You take a half-bridge and you can use the full-bridge. You can use the same open-lamp circuitry. Basically, these are choices you make. I think Professor Sante put it best. You have a variety of choices you can make, and to some extent, they're independent.  We're going to give some time to Mr. Freel. Good morning, everyone. I'm Tom Freel, a Cooley-Goddard chronicist representing Azus Tech Computer and Advanced Semiconductor Manufacturing Corporation. I'm here to answer any questions that the panel might have with respect to issues, any special issues relating to Azus Tech or ASMC. If there are none, then... Thank you, Tom Freel. Thank you. Mr. Conso, you have five minutes. Thank you, Your Honor. The court-appointed expert did testify on validity and infringement and rendered what is a legal conclusion on the subject of obviousness. Let me read from A11021. The jury was specifically instructed that they didn't have to follow that, right? That's true. If it's just an expert opinion, they can reject it. In fact, they can reject it in some respects. Not that it's just an expert opinion, Your Honor. But this is the court's expert. And NPS went to great lengths throughout its argument to say, this is the only independent expert. This is the one that you should believe. This is the one that doesn't have an action. That's the danger of having the independent expert. But that was a process you allowed to go forth, right? No, absolutely not. I did not allow that to go forth. I objected to the jury instructions. An objection that we can look at. I objected to the jury instructions, yes. And if you look at the briefing, you will see that we objected not only to the appointment. We objected to him rendering opinions on validity and infringement. In other words, the ultimate issue. If he had simply testified about the technology, which was the premise upon which the court first talked about an expert, her premise was that it was foolishness to think that a jury could understand this technology and that she was going to appoint an independent expert to help them understand it. That's not what happened in this case. Dr. Santee had precious little understanding of what an obviousness analysis means, for example. I asked him. I guess he couldn't testify to that, then, if he knew very little about it. He testified only to the technology. But he did render opinions. Are you saying that he testified to the obviousness and he didn't know what he was talking about, or he couldn't, was not able to testify to obviousness? No, he rendered opinions on obviousness and anticipation and infringement. And I asked him on 11-021, quote, Now, when you were thinking about whether or not your opinion on Claim 12 should be that it was obvious or not, what burden of proof did you use? Answer. I don't understand the question. Dr. Santee had never done this before. He had no guidance. He did not understand what the legal framework is that should have informed him. But you do agree the jury was properly charged with the legal standard, highly properly. The jury was properly charged with that legal standard. That's true. On the question of obviousness. On the question of obviousness, yes. I take no issue with the obviousness instruction per se. What I take issue with is the court allowing someone who was not competent to render these opinions when there were two party witnesses who were competent to do that, who had experience. One of them was a patent agent. And allowing basically a 3-2 lottery to occur here. That's what the Hearn Court in the District of Louisiana said. They measured opinion on obviousness. The individual, especially the individual experts of the parties also testified on the issue of obviousness. Yes. Including your experts. Yes, they did. They did. And what the Hearn Court in Louisiana said when it refused exactly this procedure is that if you don't do anything else, you create a 3-2 balance. And in this particular case, Dr. Schanke did no independent analysis. He says that in his testimony on A11021. He looked at the expert reports, basically chose between them, decided to go with the MIT professor, and that's the way this came out. But you're saying also that the instructions that were provided by the judge, protective instructions as to how to weigh the evidence, were insufficient. I'm saying that the, I'm not sure which instruction you're referring to. The instructions regarding the 706 expert. Yes. I think that, first of all, he shouldn't have been allowed to testify as to ultimate issues. He was incompetent. Aside from that, weren't there instructions in the record from the judge saying that you need to treat that person neutral on the issues? Yes. Yes, there was. So those instructions were insufficient. I believe they were insufficient, but the main issue in this particular case is that the court rushed to implement this procedure in a manner that simply dictated that it was going to result in an unfair trial, and that's exactly what happened in this case. Would you be complaining if he testified for you? Yes, I think if he, well, first of all, we wouldn't be appealing if he did. We would be on the other side of it. I understand. But you understand that there were issues that he did testify favorably for us. He testified that Claim 12 should be infringed under the Doctrine of Equivalence, and that should be overturned as well. Now, we would not be the appellant if he had sided with us. I think we would have been very happy about it, and that's not what happened here. And that's not the way these trials should be held. This court is doing it in at least one other case that I know of. This is going to become the blueprint for patent cases. It's going to be a, quote, independent expert-determined result. In case after case, you're going to see this time and time again. What are you saying? This court is doing this? The lower court. You're saying this particular, the Northern District of California and this particular judge? Only this particular judge, Judge Wilkin. Well, that's one judge out of many there, right? I agree, but precedent is precedent, and if there is a crutch that could be used in this manner, I think there's a substantial risk that it will be done. Under what circumstances would you allow a 706 expert to do that? I think, first of all, if the party experts are inadequate for some reason or another or are not there, I think that allowing the expert to testify on the technology, if there is a perceived need for that, could be all right. But allowing the independent expert to side with one party or the other is simply unfair. Thank you, Mr. Brunsell. Our next case with some familiar faces.